Slip Op. 09-42

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                          :
AD HOC SHRIMP TRADE ACTION                :
COMMITTEE,                                :
                                          :
            Plaintiff,                    :        Before:        WALLACH, Judge
                                          :        Consol. Court No.:   07-00378
    v.                                    :
                                          :
UNITED STATES,                            :        **PUBLIC VERSION**
                                          :
            Defendant,                    :
                                          :
    and                                   :
                                          :
THAI I-MEI FROZEN                         :
FOODS CO., LTD. et al.,                   :
                                          :
            Defendant-Intervenors.        :
_____:

[Plaintiffs' Motions for Judgment Upon the Agency Record are DENIED and Commerce's Determination is AFFIRMED.]

Dated: May 13, 2009

Dewey & Leboeuf LLP (Bradford L. Ward, David A. Bentley, and Nathaniel M. Rickard) for Plaintiff Ad Hoc Shrimp Trade Action Committee.

Steptoe & Johnson LLP (Eric C. Emerson and Michael T. Gershberg) for Plaintiff Thai I-Mei Frozen Foods Co., Ltd.

Michael F. Hertz, Deputy Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Stephen C. Tosini); and Matthew D. Walden, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Counsel, for Defendant United States.

## OPINION

**Wallach, Judge:**

## I
## INTRODUCTION

This action arises out of an administrative review of an antidumping order covering certain warmwater shrimp from Thailand conducted by the United States Department of Commerce ("Commerce"). Plaintiffs Ad Hoc Shrimp Trade Action Committee ("Ad Hoc"), an association of domestic producers and processors of warmwater shrimp, and Thai I-Mei Frozen Foods Co., Ltd. ("Thai I-Mei"), an exporter of warmwater shrimp, challenge certain decisions made by Commerce during the course of the administrative review.  Ad Hoc contests: (1) Commerce's decision not to apply 19 U.S.C. § 1677b(d) to Thai I-Mei's normal value calculations, (2) Commerce's calculation of Thai I-Mei's constructed export price ("CEP") profit, (3) Commerce's classification of Good Luck Product Co. Ltd.'s ("Good Luck") defective merchandise as an "indirect selling expense," and (4) Commerce's decision not to apply adverse facts available when calculating the dumping margin for Fortune Frozen Foods ("Fortune"). Thai I-Mei contests: (1) Commerce's choice of its constructed value ("CV") methodology as it pertains to the general and administrative ("G&A") expense component, (2) Commerce's calculation of Thai I-Mei's G&A and interest expenses ratios, (3) Commerce's denial of Thai I-Mei's CEP offset, and (4) Commerce's calculation of Thai I-Mei's assessment rate.

This court has jurisdiction under 28 U.S.C. § 1581(c).  Because the challenged decisions are supported by substantial evidence and otherwise in accordance with law, Commerce's determination in <u>Certain Frozen Warmwater Shrimp from Thailand: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review</u>, 72 Fed. Reg. 52,065 (September 12, 2007) ("Final Results") is AFFIRMED.

## II

## BACKGROUND

On April 7, 2006, Commerce initiated the first administrative review of an antidumping duty order covering certain frozen warmwater shrimp from Thailand. Notice of Initiation of Administrative Reviews of the Antidumping Duty Orders on Certain Frozen Warmwater Shrimp from Brazil, Ecuador, India and Thailand, 71 Fed. Reg. 17,819 (April 7, 2006).  The period of review was from August 4, 2004 to January 31, 2006. Id.  Commerce selected as mandatory respondents the three largest Thai exporters of frozen warmwater shrimp in the respondent selection poll: Good Luck, Thai I-Mei, and Pakfood Public Co., Ltd, ("Pakfood"). Memorandum from Irene D. Tzafolias, Acting Director, Office AD/CVD Operations, to Stephen J. Claeys, Deputy Assistant Secretary for Import Administration, U.S. Department of Commerce, Re: Antidumping Duty Administrative Review of Certain Frozen Warmwater Shrimp from Thailand: Selection of Respondents (July 11, 2006), Public Record ("P.R.") 239, at 6.

On March 9, 2007, Commerce published its preliminary results in the Federal Register. See Certain Frozen Warmwater Shrimp from Thailand: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review, 72 Fed. Reg. 10,669 (March 9, 2007) ("Preliminary Results").  Thereafter, on September 12, 2007, Commerce issued the final results of this review.  Final Results, 72 Fed. Reg. 52,065.  For the three selected respondents, Commerce found the following dumping margins: 10.75% for Good Luck, 2.58% for Thai I-Mei, and 4.29% for Pakfood. Id. at 52,069.  For the fifteen respondents subject to the review who were not selected for examination, Commerce calculated a dumping margin of 4.31%, id.; this rate was based on the weighted average of the margins calculated for the three selected respondents, id. at n.5. Commerce also applied an adverse facts available ("AFA") margin of

57.64% to six respondents who did not cooperate with Commerce's requests for information. Id. On October 12, 2007, Ad Hoc filed this action under court number 07-00378.  On January 4, 2008, Thai I-Mei was admitted as a Defendant-Intervenor in Ad Hoc Shrimp Trade Action Committee v. United States, Court Number 07-00378.[1]  Thereafter, on January 11, 2008, the court entered an order consolidating Ad Hoc Shrimp Trade Action Committee v. United States, Court Number 07-00378, and Thai I-Mei Frozen Foods Co., Ltd. v. United States, Court Number 07-00381, under consolidated Court Number 07-00378.[2]

### III
### STANDARD OF REVIEW

The court must uphold a determination by Commerce resulting from an administrative review of an antidumping duty order unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); Carpenter Tech. Corp. v. United States, 510 F.3d 1370, 1373 (Fed. Cir. 2007).

The substantial evidence test "requires only that there be evidence that a reasonable mind might accept as adequate to support a conclusion." Cleo Inc. v. United States, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S. Ct. 456, 95 L. Ed. 456 (1951)).  Even if it is possible to draw two inconsistent conclusions from the evidence contained in the record, this does not render Commerce's findings unsupported by

---

[1] On December 3, 2007, Thai I-Mei Frozen Foods Co., Ltd. ("Thai I-Mei") requested the right to intervene in this action.  Because Thai I-Mei is an interested party to the administrative review from which this action arises (the first administrative review of antidumping duty order against frozen warmwater shrimp from Thailand) and several of Ad Hoc Shrimp Trade Action Committee's ("Ad Hoc") claims involve challenges to Commerce's calculation of Thai I-Mei's dumping margin, the court granted Thai I-Mei's Consent Motion to Intervene on January 4, 2008.

[2] In this consolidated action, Thai I-Mei is a plaintiff alongside Ad Hoc, because both parties are contesting Commerce's findings resulting from this particular administrative review as set out in Certain Frozen Warmwater Shrimp from Thailand:Final Results and Final Partial Rescission of Antidumping Duty Administrative Review, 72 Fed. Reg. 52,065 (September 12, 2007) ("Final Results").

substantial evidence. <u>Consolo v. Fed. Mar. Comm'n</u>, 383 U.S. 607, 620, 86 S. Ct. 1018,16 L. Ed. 2d 131 (1966).

While the court must consider contradictory evidence, "the substantial evidence test does not require that there be an absence of evidence detracting from the agency's conclusion, nor is there an absence of substantial evidence simply because the reviewing court would have reached a different conclusion based on the same record. <u>Cleo</u>, 501 F.3d at 1296 (citing <u>Universal Camera</u>, 340 U.S. at 487-88); <u>see also</u> <u>Am. Silicon Techs. v. United States</u>, 261 F.3d 1371, 1376 (Fed. Cir. 2001); <u>U.S. Steel Group v. United States</u>, 96 F.3d 1352, 1357 (Fed. Cir. 1996).

To determine whether Commerce's interpretation and application of the antidumping statute at issue "is in accordance with the law," the court must conduct the two-step analysis articulated by the Supreme Court in <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). <u>See</u> <u>Pesquera Mares Australes Ltda. v. United States</u>, 266 F.3d 1372, 1382 (Fed. Cir. 2001) ("[S]tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under <u>Chevron</u>."). Under the first step of the <u>Chevron</u> analysis, the court must ascertain "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Wheatland Tube Co. v. United States</u>, 495 F.3d 1355, 1359 (Fed. Cir. 2007) (citing <u>Chevron</u>, 467 U.S. at 842-43).

The court reaches the second step of the <u>Chevron</u> analysis only "if the statute is silent or ambiguous with respect to the specific issue." <u>Id.</u> (citing <u>Chevron</u>, 467 U.S. at 843). Under this second step, the court must evaluate whether Commerce's interpretation "is based on a permissible construction of the statute." <u>Chevron</u>, 467 U.S. at 843 n.11. The agency's

construction need not be the only reasonable interpretation or even the most reasonable

interpretation. <u>Zenith Radio Corp. v. United States</u>, 437 U.S. 443, 450, 98 S. Ct. 2441, 57 L. Ed.

2d 337 (1978).  The court must defer to Commerce's reasonable interpretation of a statute even if

it might have adopted another interpretation if the question had first arisen in a judicial

proceeding. <u>Id.</u> (citations omitted).

## IV
## DISCUSSION

### A
### <u>Legal Framework Of Antidumping</u>

Goods imported into the United States are subject to an antidumping duty if Commerce

determines that foreign merchandise is being sold in the United States at "less than its fair

value."[3] 19 U.S.C. § 1673; <u>Ad Hoc Shrimp Trade Action Comm. v. United States</u>, 515 F.3d

1372, 1375 (Fed. Cir. 2008).  The amount of the antidumping duty reflects the amount by which

the home-market price of the foreign like product (the "normal value") exceeds the price charged

in the United States (the "export price"). 19 U.S.C. § 1677b(a)(1)(A)-(B).  The U.S. price is

calculated in one of two ways, as either the export price or the constructed export price,

depending on the relationship between the producer or exporter and the U.S. purchaser. 19

U.S.C. § 1677a(a)-(b); <u>Ta Chen Stainless Steel Pipe, Ltd., v. United States</u>, 28 CIT 627,630, 342

F. Supp. 2d 1191, 1194 (2004).  The difference between the normal value and the export price or

constructed export price is referred to as the "dumping margin." 19 U.S.C. § 1677(35)(A).  After

---

[3] In addition to the requirement that the United States Department of Commerce ("Commerce") make a less-than-fair-value determination, the statute also requires a finding by the International Trade Commission ("Commission") that a domestic industry will be injured by imports or sales of that merchandise before an antidumping duty can be imposed. 19 U.S.C. § 1673; <u>Fagersta Stainless AB v. United States</u>, 577 F. Supp. 2d 1270, 1275 n.1 (CIT 2008).  The Commission's inquiry is not relevant to the issues raised in this case.  For a comprehensive overview of the statutory regime governing the imposition of antidumping duties, see <u>Ad Hoc Shrimp Trade Action Comm. v. United States</u>, 515 F. 3d 1372, 1375-76 (Fed. Cir. 2008), and <u>FAG Italia S.p.A. v. United States</u>, 291 F. 3d 806, 808-809 (Fed. Cir. 2002).

an antidumping duty order is issued, the amount of the antidumping duty may be revised in subsequent administrative reviews. 19 U.S.C. § 1675(a)(1)(B).

In a subsequent administrative review, Commerce recalculates the normal value (or constructed value) and the export price (or constructed export price) to establish an updated dumping margin. 19 U.S.C. § 1675(a)(2)(A)(i)-(ii).  Because the sale prices used to determine normal value and the U.S. price (whether calculated on the basis of export price or constructed export price) occur at different points in the chain of commerce and under different circumstances, certain adjustments are made in an to attempt to make them comparable. Ta Chen, 28 CIT at 630.  Thus, the objective of making adjustments to account for such costs as packing expenses, duties, taxes, and shipping costs is to ensure "apples to apples" price comparisons. Id. See Thai I-Mei Frozen Foods Co., Ltd. v. United States, 477 F. Supp. 2d 1332, 1357 (CIT 2007). ("In implementing the antidumping statute, Commerce is to calculate antidumping margins as accurately as possible.  To ensure compliance with this purpose, Commerce is directed to make case-by-case determinations and consider data unique to the particular case before it . . .") (citations omitted).  When the U.S. price is calculated as the "constructed export price," certain additional adjustments are made to account for selling expenses in the United States. 19 U.S.C. § 1677a(d)(1).


**B**
**Ad Hoc Has Not Overcome Commerce's Determinations**

Ad Hoc challenges four aspects of Commerce's determination.  Each of the challenged aspects of the determination are upheld.  First, Ad Hoc argues that Commerce failed to apply to Thai I-Mei the special rule for calculation of normal value for goods produced by multinational corporations, 19 U.S.C. § 1677b(d) ("MNC Provision").  Commerce permissibly elected not to

apply the MNC Provision to calculate the normal value of Thai I-Mei's goods because some of

Thai I-Mei's affiliates are located in nonmarket economy countries.  Second, Ad Hoc claims that

because of its general position at the administrative level regarding Commerce's alleged

violation of 19 U.S.C. § 1677a(f)(2)(c), it is entitled to judicial review.  Yet, prior to filing its

Motion for Judgment Upon the Agency Record, Ad Hoc never argued that Commerce violated

that specific section, either directly or by implication, and, thus, failed to exhaust its

administrative remedies.  Third, Ad Hoc claims that expenses related to defective products sold

by Good Luck in the United States should be categorized as direct selling expenses because they

bear a direct relationship to the particular sale.  However, Good Luck eliminated the defective

products from the "quantity sold" category analysis and Commerce accordingly categorized the

expenses as "indirect selling expenses."  Fourth, Ad Hoc argues that Commerce used unfettered

discretion when it did not apply adverse facts available to calculate Fortune's dumping margin.

In making that decision, however, Commerce acted within the legal limits of its discretion.

**1**

**Commerce's Decision Not To Apply The MNC Provision To Thai I-Mei Is In Accordance With Law**

Ad Hoc argues that all three elements of the MNC Provision apply to Thai I-Mei and that

Commerce's failure to apply the MNC Provision to Thai I-Mei is "premised upon an

unsustainable reading of the statute." Memorandum of Law in Support of Plaintiff Ad Hoc

Shrimp Trade Action Committee's Rule 56.2 Motion for Judgment Upon the Agency Record

("Ad Hoc's Motion") at 6.  Ad Hoc claims that Thai I-Mei fulfills all three of the MNC

Provision's statutory criteria and, accordingly, that the MNC Provision should be applied to Thai

I-Mei. Id. at 6-8.

a

Thai I-Mei Does Not Meet the Second Element of the MNC Provision

Ad Hoc claims that Thai I-Mei satisfied all three criteria of the MNC Provision. Id. at 6-

7.  The three elements of the MNC Provision are: (1) the company (Ad Hoc) that exported

merchandise to the United States also owns and controls producers of similar merchandise in

other countries (here, the People's Republic of China ("PRC") and Vietnam); (2) 19 U.S.C. §

1677b(a)(1)(C) applies[4]; and (3) the normal value of the foreign like product produced outside

the exporting country is higher than the normal value of the foreign like product produced in the

facilities located in the exporting country, here, Thailand.[5]  At issue is whether the second

---

[4] That provision states, in pertinent part, that it applies when Commerce

> "determines that the aggregate quantity (or, if quantity is not
> appropriate, value) of the foreign like product sold in the exporting
> country is insufficient to permit a proper comparison with the sales of
> the subject merchandise to the United States, the aggregate quantity (or
> value) of the foreign like product sold in the exporting country shall
> normally be considered to be insufficient if such quantity(or value) is
> less than 5 percent of the aggregate quantity (or value) of sales of the
> subject merchandise to the United States."

19 U.S.C. § 1677b(a)(1)(C)(ii)

[5] 19 U.S.C. § 1677b(d), the multinational corporation provision ("MNC Provision") states, in its entirety:

> Whenever, in the course of an investigation under this subtitle, the
> administering authority determines that-(1)subject merchandise
> exported to the United States is being produced in facilities which are
> owned or controlled, directly or indirectly, by a person, firm, or
> corporation which also owns or controls, directly or indirectly, other
> facilities for the production of the foreign like product which are located
> in another country or countries,
> (2) subsection (a)(1)(C) of this section [19 U.S.C. § 1677b(a)(1)(C)]
> applies,
> (3) the normal value of the foreign like product produced in one or
> more of the facilities outside the exporting country is higher than the
> normal value of the foreign like product produced in the facilities
> located in the exporting country, it shall determine the normal value of
> the subject merchandise by reference to normal value at which the
> foreign like product is sold in substantial quantities from one or more
> facilities outside the exporting country.  The administering authority, in
> making any determination under this paragraph, shall make
> adjustments for the differences between the cost of production

element of the MNC Provision (whether 19 U.S.C. § 1677b(a)(1)(c) applies to Thai I-Mei) has

been met.

Ad Hoc argues that element two of the MNC Provision has been met because Thai I-

Mei's home market sales during the POR constituted less than five percent of its U.S. sales, and

thus, Thai I-Mei did not have a viable home market. Ad Hoc's Motion at 7-8.  Ad Hoc argues

that because Thai I-Mei did not have a viable home market, its normal value was replaced by

constructed value, and that Commerce cannot use constructed value as normal value unless 19

U.S.C. § 1677b(a)(1)(c) applies. Id. at 8 (citing 19 U.S.C. § 1677b(a)(4)).  Correspondingly, Ad

Hoc argues that "it is clear" that Thai I-Mei met element two of the MNC Provision. Id.

Thai I-Mei had neither a viable home market during the review nor any viable third

country markets[6] and, as a result, its normal value was based on constructed value under 19

---

       (including taxes, labor, materials and overhead) of the foreign like
       product produced in facilities outside the exporting country and costs
       of production of the foreign like product produced in facilities in the
       exporting country, if such differences are demonstrated to its
       satisfaction.  For purposes of this subsection, in determining the
       normal value of the foreign like product produced in a country outside
       of the exporting country, the administering authority shall determine its
       price at the time of exportation from the exporting country and shall
       make any adjustments required by subsection (a) of this section for the
       cost of all containers and coverings and all other costs, charges, and
       expenses incident to placing the merchandise in condition packed
       ready for shipment to the United States by reference to such costs in
       the exporting country.

19 U.S.C. § 1677b(d).

[6] Thai I-Mei is affiliated with companies in the third country markets of PRC and Vietnam, both
nonmarket economies. See Memorandum from Stephen J. Claeys, Deputy Assistant Secretary for Import
Administration, to David M. Spooner, Assistant Secretary for Import Administration, U.S. Department of
Commerce, Re: Issues and Decision Memorandum for the Antidumping Duty Administrative Review on
Certain Frozen Warmwater Shrimp from Thailand- August 4, 2004, through January 31, 2006 (September
5, 2007), P.R. 532 ("Final Decision Memo") cmt. 10, at 32.  A nonmarket economy country is any foreign
country that Commerce "determines does not operate on market principles of cost or pricing structures, so
that sales of merchandise in such country do not reflect the fair value of the merchandise. 19 U.S.C. §
1677(18)(A).

U.S.C. § 1677b(a)(4).[7]  However, Commerce correctly concluded that element two of the MNC

Provision could not be applied to Thai I-Mei because normal value was not based upon actual

sales.  See Memorandum from Stephen J. Claeys, Deputy Assistant Secretary for Import

Administration, to David M. Spooner, Assistant Secretary for Import Administration, U.S.

Department of Commerce, Re: Issues and Decision Memorandum for the Antidumping Duty

Administrative Review on Certain Frozen Warmwater Shrimp from Thailand- August 4, 2004,

through January 31, 2006 (September 5, 2007), P.R. 532 ("Final Decision Memo") cmt. 10, at

38.  Thai I-Mei's normal value was not based upon actual sales because the sales from PRC and

Vietnam cannot form a proper basis for comparison as they are nonmarket economies.

Georgetown Steel Corp. v. United States, 801 F.2d 1308, 1316 (Fed. Cir. 1986) (quoting S. Rep.

No. 93-1298, at 174 (1974), reprinted in 1974 U.S.C.C.A.N. 7186, 7311) ("[I]n state-controlled-

economy countries . . . the supply and demand forces do not operate to produce prices, either in

the home market or in third countries, which can be relied upon for comparison.")[8]  Because

PRC and Vietnam were Thai I-Mei's affiliates and third country markets in the administrative

review, their normal values were derived from surrogate values under 19 U.S.C. § 1677b(c) and

not from actual sales of the foreign like product.  Accordingly, when there are nonmarket

economies, Commerce calculates normal value using the factors of production methodology. See

e.g.Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy

---

[7] 19 U.S.C. § 1677b(a)(4) provides that if Commerce determines that the normal value of the subject merchandise cannot be determined under paragraph (1)(B)(i) [the price at which the foreign like product is first sold for consumption in the exporting country], then, notwithstanding paragraph (1)(B)(ii) [which provides instructions for determining the normal value based on third-country sales when the aggregate quantity or value of the foreign like product sold in the exporting country is insufficient for comparison purposes], the normal value of the subject merchandise may be the constructed value of that merchandise, as determined under subsection(e) of this section. [19 U.S.C. § 1677b(e)].

[8] Although the special "surrogate country" method enacted in 1974 for determining whether goods from nonmarket economy countries were being dumped, was repealed in 1976, Congress reenacted that special provision in the Trade Agreements Act of 1979. See Pub. L. No. 96-39, title I, S101, 93 Stat. 182.

Wages, Duty Drawback; and Requests for Comments, 71 Fed. Reg. 61,716 (October 19, 2006);

See Final Decision Memo cmt. 10, at 37. ("In [nonmarket economy] cases, [Commerce]

disregards home market prices and the respondent's cost of production and calculates [normal

value] on the reported factors of production.").  When Commerce uses the factors of production

methodology to calculate normal value, the MNC Provision does not apply because element two

(whether 19 U.S.C. § 1677b(a)(1)(C) applies) has not been met.

Ad Hoc made this same argument in the parallel review involving shrimp from China in

which Commerce concluded that the MNC Provision does not apply because the second element,

(that 19 U.S.C. § 1677b(a)(1)(c) applies) is not satisfied when the exporting country is a

nonmarket economy country. See Certain Frozen Warmwater Shrimp from the People's

Republic of China: Notice of Final Results and Rescission in Part, of 2004/2006 Antidumping

Duty Administrative and New Shipper Reviews, 72 Fed. Reg. 52,049 (September 12, 2007), and

accompanying Issues and Decision Memorandum at cmt. 12.  Ad Hoc's argument here, taken in

context with Certain Frozen Warmwater Shrimp from China, suggests that the MNC Provision

should apply when a nonmarket economy country is a non-exporting country, but should not

apply when a nonmarket economy is an exporting country.  It would be anomalous to interpret

the MNC Provision as defining the term "multinational corporation" to include situations where

there is a nonmarket economy in the non-exporting country but not in the exporting country

because the normal value for Thai I-Mei's affiliates in the non-exporting country is not based on

sales.

If the MNC Provision were applied in the manner Ad Hoc advocates, Commerce would

be obligated to use the sales prices of Thai I-Mei's affiliates even though they operate in

nonmarket economy countries, as the basis for normal value; this would result in the use of a

nonmarket economy country company's actual sales values as the basis for normal value. <u>See</u> MNC Provision.  Ad Hoc's suggested interpretation of the MNC Provision would contradict the entire premise of 19 U.S.C. § 1677b(c)[9], which provides for the use of surrogate values to determine normal value for nonmarket economy respondents.  Lastly, Ad Hoc's interpretation would contradict the recognized concept that nonmarket economy sales prices cannot be used as a basis for normal value because of the likely price distortion. <u>See</u> <u>e.g.</u> <u>ICC Industries, Inc. v. United States</u>, 812 F.2d 694, 697 (Fed. Cir. 1987) ("Home market prices and costs are meaningless as a source of 'fair value' in [nonmarket economy] countries in view of the level of intervention by the government in setting relative prices.")

Because of the possibility of price distortion coming from the nonmarket economy affiliate countries, and Ad Hoc's failure to prove that element two of the MNC Provision applies to Thai I-Mei, Commerce correctly declined to apply the MNC Provision.

b<br>
<u>Commerce's Interpretation of the MNC Provision Is Reasonable</u>

In addition to arguing that Thai I-Mei satisfies all three elements of the MNC Provision, Ad Hoc claims that Commerce's interpretation of the MNC Provision is "seriously flawed." Ad Hoc's Motion at 9.  Ad Hoc argues that Commerce's interpretation of the legislative history "is inconsistent with the express language" of the MNC Provision. <u>Id.</u>

Because the MNC Provision is silent with respect to its application in the nonmarket

---

[9] 19 U.S.C. § 1677b(c) provides, in relevant part that if merchandise is exported from a nonmarket economy country and Commerce finds that the available information does not allow for calculation of normal value as provided in 19 U.S.C. § 1677b(a), Commerce shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses.  Except as provided in [19 U.S.C. § 1677b(c)(2)], the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce].

economy context, Commerce's construction of the provision is evaluated for its reasonableness. <u>Chevron</u>, 467 U.S. at 844. Commerce's interpretation and application of the MNC Provision with respect to Thai I-Mei is reasonable in light of the statutory language and the legislative history.

The MNC Provision says that when all three elements described are satisfied, Commerce determines normal value by reference to the normal value at which the foreign like product is "sold" from facilities outside the exporting country. 19 U.S.C. § 1677b(d). The word "sold" in the statute indicates Congress intended Commerce to examine sale prices in the non-exporting country to determine normal value. In a nonmarket economy, Commerce does not consider sales prices because they are unreliable. <u>See</u> 19 U.S.C. § 1677(18)(A) (noting that "sales of merchandise in [a nonmarket economy] country do not reflect the fair value of the merchandise"). The MNC Provision also instructs Commerce to determine the normal value of the foreign like product in the exporting country by reference to the normal value at which it is sold from the non-exporting country, as adjusted under 19 U.S.C. § 1677b(a). <u>See</u> 19 U.S.C. § 1677b(d). Terms such as "sold," "cost of production," and "price" used in the MNC Provision regarding calculation of normal value in the non-exporting country show Congressional intent that the MNC Provision not apply when the non-exporting country is a nonmarket economy because these terms are not applicable to nonmarket economies.[10]

The legislative history of the MNC Provision shows Congress was primarily concerned with situations where the home market was not viable and yet a respondent's low priced exports to the United States market were supported by higher priced sales of its affiliate in a third

---

[10] There is a presumption with nonmarket economies that factors of production are under the control of the state and home market sales are usually not reliable indicators of normal value. <u>Goldlink Indus. Co. v. United States</u>, 30 CIT 616, 619 431 F. Supp. 2d 1323, 1326 (2006) (citing 19 U.S.C. § 1677(18)(A), (C)).

country market. S. Rep. No. 93-1298, at 174, 1974 U.S.C.C.A.N. at 7311.  Before the enactment

of the MNC Provision in 1974, there was no means to counteract such discriminatory pricing, i.e.

the setting of high prices in one foreign country to support low-priced exports to the United

States from another country. See id.  The MNC Provision allows use of the affiliate's normal

value in the non-exporting country (i.e., the company with "high-priced" home market sales) to

compare to the United States price of the affiliate in the exporting country. 19 U.S.C. § 1677b(d);

S. Rep. No. 93-1298 at 174, 1974 U.S.C.C.A.N. at 7311.  This legislative concern does not

appear to encompass respondents from nonmarket economies because the MNC Provision was

designed to address discriminatory pricing behavior by the multinational corporation, it was not

meant to apply when one affiliate within the multinational corporation is located in a nonmarket

economy. See S. Rep. No. 93-1298 1974 U.S.C.C.A.N. at 7311-13.  Accordingly, Commerce

sought to address pricing practices of multinational corporations through the use of normal value

of other countries not in the proceeding.  Nonmarket affiliate countries do not set home market

prices in the way a market economy would, nor in the way Congress envisioned because their

prices are subject to state government control, and as a result were not intended by Congress to

be included in the MNC Provision. See id.; See also Georgetown Steel Corp. v. United States,

801 F.2d at 1316.

 Commerce declined to treat Thai I-Mei as an MNC because the non-exporting country

was a nonmarket economy.  The MNC Provision was intended to provide a remedy for

discriminatory pricing by a multinational corporation which sells products of a plant in one

foreign county at low prices to the United States, while the same company or its subsidiary in

another foreign country subsidizes those low-priced sales with high-priced sales of the same

product to customers in its own market.  S.Rep. No. 93-1298 at 174, 1994 U.S.C.C.A.N. at 7311;

see also Kerr-McGee Chem. Corp. v. United States, 14 CIT 422, 424 (1990).  Ad Hoc's

proposed interpretation contradicts the language and intent of the MNC Provision, and

Commerce acted reasonably when it chose not to apply the MNC Provision to Thai I-Mei.

**2**
**Ad Hoc Did Not Exhaust Its Administrative Remedies With Respect To Its CEP Profit Calculations Argument**

Ad Hoc's case brief in the administrative proceeding below challenged Commerce's

preliminary calculation of CEP profit on the ground that it was "based on a misinterpretation of

[Commerce's Import Administration Policy Bulletin No. 97/1]… and [agency] practice." Ad

Hoc Case Brief, Case No. A-549-822, U.S. Department of Commerce, Import Administration

(April 16, 2007) P.R. 503 ("Ad Hoc Administrative Case Brief") at 19.  In its Administrative

Case Brief, Ad Hoc argued that Commerce should use the information submitted by Thai I-Mei

regarding its expenses to calculate the CEP profit amount rather than the information from Thai

I-Mei's POR financial statements. Id. at 22.  Commerce addressed this argument in the Final

Decision Memo. See Final Decision Memo cmt. 14 at 59.  Now, in its Motion for Judgment

Upon the Agency Record, Ad Hoc argues that Commerce misapplied 19 U.S.C. §

1677a(f)(2)(c)(iii) by failing to include the majority of Thai I-Mei's profit experience and

respondents' sales of subject merchandise in all countries . Ad Hoc's Motion at 14-15.

Commerce claims Ad Hoc never raised this argument in its Administrative Case Brief

and, as a result, that it failed to exhaust its administrative remedies with respect to that argument.

Defendant's Response at 19.  Furthermore, Commerce argues that to allow Ad Hoc to continue

with this argument would "deprive Commerce of the opportunity to address this issue in the first

instance." Id. at 21.

Ad Hoc counters Commerce's exhaustion argument by claiming the point raised by Ad

Hoc is not new but instead "merely a greater explication of the same issue raised in Plaintiff's

Administrative case brief below." Plaintiff Ad Hoc Shrimp Trade Action Committee's Reply

Brief in Support of Rule 56.2 Motion for Judgment upon the Agency Record ("Ad Hoc's Reply")

at 5.  Ad Hoc says that it is not arguing about whether Commerce should take the profit

information of Thai I-Mei's affiliated importer, Ocean Duke, into account when calculating Thai

I-Mei's CEP profit amount; rather it claims it is "simply explaining that Commerce should not

use Thai I-Mei's POR financial statements given that Thai I-Mei's relationship with Ocean Duke

renders Thai I-Mei's financial statement incomplete." Id. at 5-6 n. 4.

The exhaustion doctrine requires "that no one is entitled to judicial relief for a supposed

or threatened injury until the prescribed administrative remedy has been exhausted." Consol.

Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003) (quoting McKart v. United

States, 395 U.S. 185, 193, 89 S. Ct. 1657, 23 L. Ed. 2d 194 (1969)).  If a party does not exhaust

available administrative remedies, "judicial review of administrative action is inappropriate."

Sharp Corp. v. United States, 837 F.2d 1058, 1062 (Fed. Cir. 1988).

Both the Federal Circuit and this court have held that failure to raise a specific argument

in a case brief, even if the general issue is addressed, constitutes a failure to exhaust

administrative remedies. See e.g., Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191

(Fed. Cir. 1990) (holding that plaintiff's failure to raise a particular argument before Commerce

precluded judicial review even though plaintiff characterized that argument as "simply another

angle to an issue" that it did raise in the administrative proceeding.)  Failure to raise a specific

argument in a case brief is a failure to exhaust administrative remedies with respect to that

argument because it "deprives [Commerce] of an opportunity to consider the matter, make its

ruling, and state the reasons for its action." Unemployment Comp. Comm'n. of Ala. v. Aragon,

329 U.S. 143, 155, 67 S. Ct. 245, 91 L. Ed. 136 (1946); Paul Muller Industrie Gmbh & Co. v.

United States, 502 F. Supp. 2d 1271, 1274-75 (CIT 2007) aff'd, (Fed. Cir. 2008) (noting that

"rais[ing] general issues regarding inventory carrying costs is not adequate to apprise Commerce

of what it would need to specifically respond to regarding [the inclusion of freight, duty, and

brokerage fees in the calculation]."

   Ad Hoc did not raise its current CEP profit calculation argument in the administrative

proceeding below.  As discussed above, the argument that Ad Hoc raised in its Motion for

Judgment Upon the Agency Record is different than the argument raised in its Administrative

Case Brief.  Compare Ad Hoc's Motion at 14-15 with Ad Hoc Administrative Case Brief at 18-

22.[11]  This change of argument deprived Commerce of the "opportunity to consider the matter,

make its ruling, and state the reason for its action." See Aragon, 329 U.S. at 155.  Accordingly,

Ad Hoc has not exhausted its administrative remedies and is not entitled to judicial relief with

respect to this argument.

---

[11] At oral argument, Ad Hoc stated that the arguments presented in its Administrative Case Brief and its Motion for Judgment Upon the Agency Record ("Ad Hoc's Motion") were the same.  In its Administrative Case Brief Ad Hoc argued that Thai I-Mei incorrectly interpreted Import Administration Policy Bulletin No. 97/1 "Calculation of Profit for Constructed Export Price Transactions" (September 4, 1997) ("Policy Bulletin No. 97/1") and that Commerce should have used the expense information submitted by Thai I-Mei to calculate Thai I-Mei's CEP profit instead of Thai I-Mei's POR financial statements. Administrative Case Brief at 18-20.  In its Motion, Ad Hoc argued that Commerce misinterpreted 19 U.S.C. § 1677a(f)(2)(c)iii and did not include Thai I-Mei's affiliate's profit and expense. Ad Hoc's Motion at 14-15.  In oral argument, Ad Hoc claimed that the argument presented in its Motion was a natural extension of Ad Hoc's Administrative Case Brief argument.  The two arguments are discrete.  Failure to raise a particular argument is a failure to exhaust administrative remedies. Unemployment Comp. Comm'n of Ala. v. Aragon, 329 U.S. 143, 155, 67 S. Ct. 245, 91 L. Ed 136 (1946).

**3**

**Good Luck's Defective Merchandise Is An "Indirect Selling Expense"**

Ad Hoc argues that Commerce erroneously treated expenses related to Good Luck's defective merchandise as "indirect selling expenses" when they are more appropriately classified as "direct selling expenses". Ad Hoc's Motion at 19.  Ad Hoc claims that this contradicts Commerce's own regulations. Id. at 19-20 (citing 19 C.F.R. § 351.410(c)).

Good Luck incurred expenses for shipping to the United States defective merchandise which was ultimately destroyed by a customer. Final Decision Memo cmt. 7, at 26-27.  Upon learning about the defective merchandise, Good Luck adjusted the "quantity sold" in its United States sales listing to accurately account for the defective merchandise. Id. at 27.  Commerce verified that Good Luck (1) excluded the products from its United States sales listing, (2) reimbursed the customer who had purchased them, and (3) reduced the "quantity sold" figure in its U.S. sales listing by reporting the amount destroyed." Id. at 28 (citing Memorandum from Irina Itkin, Senior Analyst, to Shawn Thompson, Program Manager, Office 2, Office of AD/CVD Operations, U.S. Department of Commerce, Re: Verification of the Sales Response of Good Luck Product Co., Ltd. in the Antidumping Administrative Review of Certain Frozen Warmwater Shrimp from Thailand (February 8, 2007), P.R. 455 ("Good Luck Verification") at 14).

Good Luck's expenses related to the defective merchandise are correctly classified as "indirect selling expenses" because the rejected merchandise was destroyed by the customer and Good Luck received no payment for the defective product. See Good Luck Verification at 14. Direct selling expenses are expenses "such as commissions, credit expenses, guarantees, and warranties, that result from, and bear a direct relationship to, the particular sale in question." 19 C.F.R. § 351.410(c); See Statement of Administrative Action, accompanying the Uruguay Round

Agreements Act, H.R. Doc. No. 103-316 ("SAA"), at 823-24 (1994), reprinted in 1994

U.S.C.C.A.N. 4040, 4163-64.[12]   Indirect selling expenses are expenses that do not bear a direct

relationship to the sale of subject merchandise, do not qualify as assumptions, and are not

commissions, although they "may be attributed (at least in part) to such [direct] sales." SAA at

824, 1994 U.S.C.C.A.N at 4164.

    This court has treated rejected merchandise expenses as "indirect selling expenses" if the

merchandise has been excluded from the "quantity sold" figure. See Agro Dutch Indus., Ltd. v.

United States, 30 CIT 320, 324 (2006), rev'd on other grounds, 508 F.3d 1024 (Fed. Cir. 2007).

In Agro Dutch, the court sustained Commerce's determination that expenses incurred to ship

rejected merchandise to and from the United States were not direct selling expenses because

"[t]he underlying U.S. sales to which they related were canceled and excluded from the dumping

analysis." Id.

    Ad Hoc argues that Agro Dutch is inapposite because it claims the case applies only

when the entire U.S. sale is canceled, not a part or portion of the sale, as is the case with Good

Luck. Ad Hoc's Reply at 9-10.   However, in Agro Dutch, the expenses were indirect because

they were canceled and excluded from dumping analysis. See Agro Dutch, 30 CIT at 324.  As in

that case, Good Luck identified and cancelled the defective merchandise at issue and excluded it

from the "quantity sold" figure, Good Luck Verification at 14, effectively making the expenses

from the defective merchandise not directly related to any sale and excluded from the dumping

analysis.

    Ad Hoc overemphasizes the "direct relationship" component of the definition of direct

_____

[12] The Statement of Administrative Action accompanying the Uruguay Round Agreements Act "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements] Act in any judicial proceeding in which a question arises concerning such interpretation or application." Timken U.S. Corp. v. United States, 421 F.3d 1350, 1355 n.2 (Fed Cir. 2005) (quoting 19 U.S.C. § 3512(d)).

selling expenses by repeatedly stating that the expenses related to Good Luck's defective products were clearly identifiable as part of a sale. See Ad Hoc's Motion at 19-20.  This argument ignores the fact that indirect expenses can be reasonably attributed to the sale and do not have to be completely unrelated. See SAA at 824, 1994 U.S.C.C.A.N. at 4164 ("Such [indirect selling] expenses would be incurred by the seller regardless of whether the particular sales in question are made, but reasonably may be attributed (at least in part) to such sales"). That the rejected merchandise was part of a shipment that included acceptable merchandise does not prohibit it from being considered an indirect selling expense because such expenses "reasonably may be attributed to such sales." See id.  The rejected merchandise was not sold and was excluded from the dumping analysis, just as in Agro Dutch.  Whether the entire shipment or only a portion is rejected is irrelevant because in the underlying sale the amount of the defective merchandise is excluded from the dumping analysis (specifically the "quantity sold" figure). Thus, the expenses do not "result from" or "bear a direct relationship to" a particular sale, as is described in the applicable regulation and the SAA. 19 C.F.R. § 351.410(c); see SAA at 824, 1994 U.S.C.C.A.N. at 4164.

**4**

**It Was Within Commerce's Discretion Not To Apply "Adverse Facts Available" When Calculating Fortune's Dumping Margin**

Ad Hoc claims that Commerce erred when it declined to apply AFA to Fortune because Fortune failed to meet multiple deadlines and Commerce allegedly asked Fortune for information at improper times. Ad Hoc's Motion at 21-22.  Ad Hoc bases this claim on an argument that Commerce acted in violation of law and yet its arguments in support relate solely to alleged weaknesses in supporting evidence. See id. at 22-28.

Commerce's use of the term "adverse facts available" refers to a two-step procedure: (1)

the use of "facts otherwise available" when information requested by Commerce is either

unavailable or deficient, 19 U.S.C. § 1677e(a); and (2) the use of "adverse inferences" in

selecting from the "facts otherwise available" when a party fails to cooperate by not acting to the

best of its ability, 19 U.S.C. § 1677e(b). See Jinan Yipin Corp v. United States, 526 F. Supp. 2d

1347, 1353 n.7 (CIT 2008).  Commerce's use of "facts otherwise available" under the first step is

subject to 19 U.S.C. § 1677m(d), which provides that if a party submits a deficient response to a

request for information, Commerce must notify the party of the deficiency and, to the extent

practicable, provide that party with an opportunity to remedy the problem.  Generally, if a party

notifies Commerce that it is having difficulty complying with a request for information,

Commerce "shall consider" the party's ability to submit the information in the requested form

and "may modify" the request. 19 U.S.C. § 1677m(c)(1) (emphasis added).

On March 2, 2007, Fortune Frozen Foods contacted Commerce and requested permission

to re-file a quantity and value ("Q&V") questionnaire response. See Memorandum from Brianne

Riker, Analyst, to the File, through Irina Itkin, Senior Analyst, Office 2, U.S. Department of

Commerce, Re: 2004-2006 Antidumping Duty Administrative Review of Certain Frozen

Warmwater Shrimp from Thailand: Telephone Conversation with Fortune Frozen Foods

(Thailand) Co., Ltd. (March 9, 2007).  Commerce exercised its discretion per CFR 351.301(b),

and instructed Fortune to file a Q&V questionnaire response after Fortune had communicated to

Commerce in July 2007 of its difficulty in compiling the information requested. Id.  Fortune

responded to Commerce and filed the pertinent information. Id.  Fortune made documented

efforts to comply with Commerce's requests for additional information. See id.; Letter from

Enoson Lai, Fortune Frozen Foods Co., Ltd., to U.S. Department of Commerce, AD/CVD

Operations, Re: Certain Frozen Warmwater Shrimp from Thailand, Format for Reporting

Quantity and Value of Sales (March 12, 2007), P.R. 482.

Commerce acted within its discretion by allowing Fortune to produce a conforming response.  Commerce's discretion in this area is recognized by this court. See, e.g. AK Steel Corp. v. United States, 28 CIT 1408, 1416-17, 346 F. Supp. 2d 1348, 1355(2004) (disregarding an argument that Commerce must prove that an importer acted to the best of its ability before declining to draw adverse inference because the argument "runs counter to the discretion afforded to Commerce [by 19 U.S.C. § 1677e(b)] in the application of adverse facts available."); NTN Corp. v. United States, 28 CIT 108, 117, 306 F. Supp. 2d 1319, 1329 (2004) ("Commerce enjoys broad, although not unlimited, discretion with regard to the propriety of its use of facts available."); see also Nat'l Steel Corp. v. United States, 18 CIT 1126, 1129, 870 F. Supp. 1130, 1134 (1994) ( "Once such deadlines have passed, whether Commerce accepts the late submissions is within its discretion.")  Commerce also acted within its discretion when it decided not to apply adverse facts available in calculating Fortune's dumping margin.  Ad Hoc has not demonstrated that these actions are "not in accordance with law." See Chevron, 467 U.S. at 842-43.

**B**
**Thai I-Mei Has Not Overcome Commerce's Determination**

Thai I-Mei challenges four aspects of Commerce's determination.  Each of the challenged aspects of the determination is upheld.  First, Thai I-Mei argues that Commerce's decision to use Thai I-Mei's own G&A and interest expense information while using other respondents' financial information to create Thai I-Mei's CV is not in accordance with law.  Commerce permissibly interpreted 19 U.S.C. § 1677e(b)(ii) when it used Thai I-Mei's own G&A and interest expense data while using other respondents' data for the other components of Thai I-Mei's CV calculation.  Second, Thai I-Mei argues that cost of manufacture ("COM") should be

used instead of cost of goods sold ("COGS") as the denominator in Thai I-Mei's G&A and interest expense ratios because COM is a more accurate figure.  However, use of COGS instead of COM to calculate Thai I-Mei's G&A and interest expense ratios is an accepted agency practice.  Third, Thai I-Mei claims it should qualify for a CEP offset, yet, Thai I-Mei has not met the necessary burden of proof because it did not prove that its normal value was established at a more advanced level of trade than the constructed export price level.  Fourth, Thai I-Mei argues that Commerce should have used the entered value of Thai I-Mei's entries during the period of review instead of the entered value of its sales during the period of review as the denominator in its antidumping duty assessment rate.  Commerce's use of the entered value of sales as the denominator was consistent with agency regulation.

**1**

**Commerce's Methodology For Calculating Thai I-Mei's Constructed Value Is In Accordance With Law**

Thai I-Mei argues that Commerce failed to correctly calculate its constructed value because it did not choose to apply in its entirety one of the methodologies listed in 19 U.S.C. § 1677b(e)(2)(B). Brief in Support of Plaintiff Thai I-Mei's Motion for Judgment Upon the Agency Record ("Thai I-Mei's Motion") at 9-10.  Thai I-Mei additionally claims that Commerce's interpretation of 19 U.S.C. § 1677b(e)(2)(B)(ii) is inconsistent with both the plain language of the statute and Commerce's past practice. Id. at 9.  Thai I-Mei states that Commerce erred when it used Thai I-Mei's own G&A and interest expenses and Pakfood and Good Luck's data for the rest of the Thai I-Mei CV components. Id.

If there is no viable third country market from which to derive a price, and there is no third country in which sales of a foreign like product exist to form an adequate basis for comparison against sales of the allegedly dumped merchandise, Commerce uses "constructed

value" to calculate normal value.19 U.S.C. § 1677b(a)(4);  See Koyo Seiko Co. v. United States, 551 F. 3d 1286, 1289 (Fed. Cir. 2008).  Constructed value becomes the proxy for normal value in these instances and is a determination of the foreign like product price. Id.  CV is normally calculated as the sum of: (1) a company's cost of manufacture, 19 U.S.C § 1677b(e)(1); (2) selling and G&A expenses (collectively cost of production) plus an amount for profit, 19 U.S.C. § 1677b(e)(2)(A); and (3) the cost of packaging. U.S.C. 19 U.S.C. § 1677b(e)(3).  With respect to the second component of the CV calculation, if actual information is not available to calculate selling expenses, G&A expenses, and profit, Commerce is directed by statute to employ one of the three methodologies described in 19 U.S.C. § 1677b(e)(2)(B).

There are three alternative methodologies used to create CV if actual data are not available with respect to the expenses described in 19 U.S.C. § 1677b(e)(2)(A).  These are: (i) actual amounts incurred and realized by the producer being investigated for selling and G&A expenses and profit in connection with foreign market sales of the general same category of products, 19 U.S.C. § 1677b(e)(2)(B)(i); (ii) the weighted average of actual amounts incurred and realized for selling and G&A expenses and profit by other producers being investigated in connection with foreign market sales in the ordinary course of trade of a foreign like product, 19 U.S.C. § 1677b(e)(2)(B)(ii); or (iii) any other reasonable method to calculate selling and G&A expenses and profit, provided that the amount for profit does not exceed the profit normally realized by other companies for foreign market sales of the same general category of products, 19 U.S.C. § 1677b(e)(2)(B)(iii). See also SAA at 840, 1994 U.S.S.C.A.N at 4176.  While 19 U.S.C. § 1677b(e)(2)(B) allows alternative methodologies to derive constructed value, there is no priority of the approaches and no one methodology has to be applied in full by Commerce. See Gulf States Tube Div. of Quanex Corp. v. United States, 21 CIT 1013, 1033-34 981 F. Supp.

630, 648 (1997) (recognizing Commerce's discretion to calculate G&A and interest expenses of normal value).

Thai I-Mei's argument that Commerce may use only one of the alternative methodologies listed in 19 U.S.C. § 1677b(e)(2)(B) ignores the critical statutory language and contradicts the purpose of using constructed value.  The statute states that one of the methodologies should be used "if actual data is not available." 19 U.S.C. § 1677b(e)(2)(B); <u>see also</u> SAA at 840, 1994 U.S.C.C.A.N. at 4176.  Commerce has interpreted this language to mean that the alternative methodologies will be used only if the statutorily preferred "actual amounts" incurred by the respondent are unavailable. <u>Final Decision Memo</u> cmt. 15 at 61.  By choosing to use Thai I-Mei's own data for G&A and interest expenses, Commerce did not bar the use of other respondents' information to construct other elements of Thai I-Mei's CV calculation.

Commerce chose to use the second alternative methodology.[13]  Here, Commerce used Thai I-Mei's available data with respect to the G&A and interest expenses and filled in the rest of the required data with information from Pakfood and Fortune. <u>Id.</u> cmt. 15, at 60.  If some actual amounts incurred by respondent are on the record, then that data is available for Commerce to use, since the actual data is preferred.

Moreover, Commerce's effort to use as much of the respondent's actual data as possible and supplement that information by using alternative methodologies to fill in the blanks embraces the purpose of CV itself, which is to be an accurate proxy for normal value. <u>Thai I-Mei</u>

_____

[13] Thai I-Mei claims in its reply that Commerce used 19 U.S.C. § 1677b(e)(2)(A) to derive the constructed value for Thai I-Mei. <u>See</u> Plaintiff Thai I-Mei Reply Brief in Support of Its Motion for Judgment Upon the Agency Record at 2 n.1 ("It was not clear from the Final Results whether Commerce used values under [19 U.S.C. § 1677b(e)(2)(A)]or [19 U.S.C. § 1677b(e)(2)(B)(iii)].  Commerce has now clarified that it was the former."(citation omitted))  However, Commerce used 19 U.S.C. § 1677b(e)(2)(B)(ii) as it stated in the <u>Final Decision Memo</u> and in Defendant's Response. <u>Final Decision Memo</u>, cmt. 15, at 58.("[Commerce] calculated Thai I-Mei's CV selling expenses and profit rate . . . under [19 U.S.C. § 1677b(e)(2)(B)(ii)].") ; Defendant's Response at 27 ("There are three . . . alternative methodologies, the second of which (alternative ii) [19 USC 1677b(e)(2)(B)(ii)] is relevant here.")

Frozen Foods Co., Ltd. v. United States, 477 F. Supp. 2d 1332, 1357 (CIT 2007) ("[I]n

implementing the antidumping statute, Commerce is to calculate antidumping margins as

accurately as possible.  To ensure compliance with this purpose, Commerce is directed to make

case-by-case determinations and consider data unique to the particular case before it . . . .")

(citations omitted).  Accordingly, Commerce acted in accordance with law when it used Thai I-

Mei's own G&A and interest expenses in an attempt to accurately calculate Thai I-Mei's CV.

**2**
**Commerce's Use Of Cost of Goods Sold In Thai I-Mei's G&A And Interest Expense**
**Ratios Is In Accordance With Law**

Thai I-Mei asserts that Commerce's methodology to calculate its G&A and interest

expense ratios is inconsistent with Commerce's established practice of adjusting (in certain

cases) the cost of goods sold ("COGS") denominator in an effort to obtain "symmetry between a

ratio and the amount to which it is applied." Thai I-Mei's Motion at 16.  Thai I-Mei claims that

Commerce does occasionally adjust COGS which is used as a denominator in the calculation of

G&A and interest expense ratios, and that Commerce erred in not adjusting Thai I-Mei's COGS

to reflect differences from COM . Thai I-Mei's Motion at 17-18.

To support its argument that Commerce has previously adjusted other respondents'

COGS denominators, Thai I-Mei cites to several reviews where Commerce has adjusted the

COGS denominator to account for differences from COM. Id.at 16-17.[14]  While Commerce

---

[14]  See Stainless Steel Sheet and Strip in Coils from Mexico; Final Results of Antidumping Duty
Administrative Review, 69 Fed. Reg. 6,259, and accompanying Issues and Decision Memorandum at cmt.
14 (February 10, 2004) (Manufacturer Mexinox received a COM offset (due to stock strip evaluation
offset) from the G&A calculation); Notice of Final Determination of Sales at Less Than Fair Value : Live
Swine from Canada, 70 Fed. Reg. 12,181, Decision and accompanying Issues and Decision Memorandum
at cmt. 13 ( March 11, 2005) (Manufacturer Oak Park received a COM offset (due to salvage value of
culled cows) ; Notice of Final Results of the Sixth Administrative Review of the Antidumping Duty
Order on Certain Pasta from Italy and Determination Not to Revoke in Part, 69 Fed. Reg. 6,255, and
accompanying Issues and Decision Memorandum at cmt. 23 ( February 10, 2004) (Exporter Tomasello
received a COM offset (due to scrap revenue offset) from the G&A calculation).

acknowledges that it has deviated from normal practice in the past and given COM adjustments, Commerce points out that it made an adjustment to Thai I-Mei's COGS in the Preliminary Results by allowing the deduction of scrap revenue, "in order to obtain symmetry between the [G &A and interest expense] ratios and the amount to which they are applied."[15] Final Decision Memo, cmt. 15, at 64-65.

While the statute provides the general description of calculating the G&A  and interest expenses for CV, it does not require a specific method of calculation. 19 U.S.C. § 1677b(e)(2). Commerce's Antidumping Manual states that "G&A [expense] is calculated by dividing the fiscal year G&A expenses by the fiscal [COGS] (adjusted for categories of expense not included in COM, such as packing) and then applying the percentage to the COM of the product." Antidumping Manual, Ch. 8 at 58, available at http://ia.ita.doc.gov/admanual.  Because there is no bright-line definition of what G&A and interest expenses are or how the corresponding ratios should be calculated, Commerce, over time, developed the methodology described in its Antidumping Manual. See Id.  Commerce's standard practice is to calculate a ratio of fiscal year G&A expenses divided by COGS, and then apply this ratio to COM to determine the exact amounts for G&A and expenses. Id.

Commerce did not make the exact changes Thai I-Mei requested.[16]  However, it did make changes relating to Thai I-Mei's scrap revenue offset and also gave a clear and reasonable explanation as to why the changes Thai I-Mei requested were not acceptable. See Final Decision

---

[15] The specific issue Commerce recognized was that in the normal books and records, Thai I-Mei recorded scrap revenues under the "other revenue" section of the financial statements.  Because Thai I-Mei offset the reported costs by this amount, Commerce allowed for the deduction of the scrap revenue from the COGS. Final Decision Memo cmt. 15, at 64.

[16] Specifically Thai I-Mei argues that Commerce should exclude the total POR inventory changes from the COGS, which is used as the denominator of the G&A and interest expense ratio calculation, in order to convert COGS to COM. Brief in Support of Plaintiff Thai I-Mei's Motion for Judgment Upon the Agency Record at 19-20.

Memo, cmt. 15 at 64-65.  Commerce found that Thai I-Mei's request did not amount to an

exceptional situation. Id.  The methodology employed by Commerce is used for year to year

accuracy and to avoid legal challenges due to the fluctuations Thai I-Mei's suggested model

creates. Id. at 65.  Commerce explained that the change Thai I-Mei requested would create

inconsistencies in the current methodology:

> [U]nlike packing/movement expenses or scrap revenue, the
> total POR inventory changes could have either a favorable or unfavorable
> effect on the expense ratios depending on whether the inventory balance
> increases or decreases in a given year. Thus from POR to POR parties
> can argue for the method that benefits them most and it is important for
> the Department to remain consistent . . .

Final Decision Memo cmt. 15, at 65.

Commerce's COGS adjustment methodology was fairly applied to Thai I-Mei in the Final

Results and is reasonably used to obtain consistency in the calculation of G&A and interest

expense ratios.

**3**

**Commerce's Decision To Deny Thai I-Mei A CEP Offset Is Supported By Substantial
Evidence**

In the Final Results, Commerce denied Thai I-Mei a CEP offset.[17] Final Decision Memo

cmt. 13, at 50.  Commerce found that although Good Luck and Pakfood performed certain sales

functions for their home market sales that Thai I-Mei did not perform for its U.S. sales, the

---

[17]A constructed export price ("CEP") offset is a reduction in the normal value amount of indirect selling of the expenses in the country in which normal value is determined on sales of the foreign like product. 19 U.S.C. § 1677b(a)(7)(B).  Commerce makes a CEP offset when it has determined that the normal value of an exporter is established at a level of trade which constitutes a more advanced stage of distribution than the level of trade of the CEP, but the data available does not provide an appropriate basis to make a level of trade adjustment under 19 U.S.C. § 1677b(A)(ii). See 19 U.S.C. § 1677b(a)(7)(B).  To establish that sales are made at different levels of trade and, thus, qualify for a CEP offset, "[s]ubstantial differences in selling activities are a necessary, but not sufficient, condition for determining there is a difference in the stage of marketing." 19 C.F.R. § 351.412(c)(2).

differences "were not material selling distinctions that were significant enough to warrant a separate [level of trade ("LOT")]. Id.  On this basis, Commerce found that Thai I-Mei's LOT was not more advanced than its level of CEP sales, and that neither a LOT adjustment nor a CEP offset was warranted. Id.  Here, Thai I-Mei asserts that Commerce erred by not considering that most of Thai I-Mei's few selling activities were performed at a low level of intensity while Good Luck's and Pakfood's selling activities were more numerous and performed [at a higher] level of intensity. Thai I-Mei's Motion at 27, 32.

Thai I-Mei also argues that its sales activities were "entirely different" than the sales activities of Good Luck and Pakfood, and that this difference would account for a LOT offset in sales and marketing. Id. at 29.  Thai I-Mei argues that it did less sales and marketing than Good Luck and Pakfood because both "Good Luck and Pakfood both "performed sales forecasting/market research, sales promotion/trade shows/advertising, and retail display activities, while Thai I-Mei did not." Id.  Commerce concluded that the "selling activities, either individually or in the aggregate, are not significant enough to conclude that the marketing stages of the companies differ." Final Decision Memo cmt 13, at 52.  Regarding sales and marketing, Commerce noted that, while Good Luck and Pakfood employees did attend trade shows, this activity was infrequent at best. Id.  Commerce found that Good Luck's sales promotion activities were limited in scope.[18] Id. at 53.

While it is Commerce's responsibility to determine if a petitioner qualifies for a CEP offset, it is the responsibility of the respondent requesting the CEP offset to procure and present

---

[18]Good Luck's sales promotion activities consisted of Good Luck employees attending a few public trade fairs at branches of Good Luck's various customers  [[ customers' names omitted ]]  and a [[ fair organized by one of Good Luck's home market customers  ]] giving away sample tastes of shrimp to certain customers. Good Luck Supplemental Sections A, B, and C Questionnaire Response. (October 25, 2006) Confidential Record ("C. R.") 76, at 17-19.

the relevant evidence to Commerce. 19 C.F.R. § 351.401(b)(1) "The interested party in possession of the relevant information must establish the amount and the nature of a desired judgment."; see also Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,370 (May 19, 1997) Antidumping Duties: Final Rule ("[A]ll adjustments, including LOT adjustments, must be demonstrated to the satisfaction of the Secretary."); Corus Eng'g Steels, Ltd. v. United States, 27 CIT 1286, 1290 (2003) ('[B]urden of proof is upon the claimant to prove entitlement [to a CEP offset].")

Thai I-Mei did not meet its burden of presenting sufficient evidence to support its request for a CEP offset because it proffered no evidence on the record to support the claims that any of the companies' selling functions were performed at different levels of intensity, despite the respondents' differing characterizations. See Thai I-Mei's Motion at 25-28.  Thai I-Mei relies on a chart comparing its selling activities to those of Pakfood and Good Luck. Thai I-Mei's Motion at 27.  The chart itself does not adequately convey the different level of trade that is required for a CEP offset because it does not describe the differences in sales activities with any particularity. Accordingly, Thai I-Mei has not met its burden of proof to qualify for a CEP offset.

**4**
**Commerce Permissibly Calculated Thai I-Mei's Assessment Rate**

In the Final Results, Commerce calculated Thai I-Mei's antidumping duty assessment rate by dividing the total antidumping duties owed during the POR by the total entered value of of Thai I-Mei's POR sales. See Final Decision Memo cmt 18 at 76 ("We have calculated Thai I-Mei's assessment rate using the dumping margin found on the sales examined ( i.e. the sales included in our margin calculations) divided by the entered value of those sales.")  Thai I-Mei argues that Commerce incorrectly calculated Thai I-Mei's antidumping duty assessment rate

when it used for the ratio the total entered value of all Thai I-Mei period of review ("POR") sales

instead of the entered value of all Thai I-Mei POR entries. Thai I-Mei's Motion at 33-38.

Thai I-Mei states that Commerce's error in its antidumping calculations results from an

"attempt to create unity between the wrong values in the assessment rate calculation" by

calculating the numerator and the denominator on the same basis. Id. at 35. Thai I-Mei argues

that Commerce's approach of using all of Thai I-Mei's sales that occurred during the POR and

applying that figure to both the numerator and denominator is wrong because it does not create

the symmetry required to collect the proper amount of antidumping duty rates. Id. Thai I-Mei

suggests that the symmetry that is required is "between the denominator of the assessment rate

and the amount to which it is applied." Id. Thai I-Mei did not provide any authority in support of

this proposition. Thai I-Mei's proposal is inconsistent with the methodology contemplated by

the relevant authority.

Pursuant to the applicable regulation, Commerce "normally will calculate the assessment

rate by dividing the dumping margin found on the subject merchandise examined by the entered

value of such merchandise covered by the review." 19 C.F.R. § 351.212(b)(1)(emphasis added).

Additionally, Commerce is to calculate such rates "by dividing the absolute dumping margin

found on merchandise reviewed by the entered value of that merchandise." Antidumping

Duties:Final Rule, 62 Fed. Reg. at 27,314. Commerce states that it has a "longstanding practice

of calculating . . . assessment rate[s] based on the ratio of the total amount of antidumping duties

calculated for the examined sales made during the POR to the total customs value of the sales

used to calculate those duties." Final Decision Memo, cmt 18 at 75 (citing Color Picture Tubes

From Japan; Final Results of Antidumping Administrative Review, 62 Fed. Reg. 34,201, 34,211

(June 25, 1997); Antifriction Bearings (Other Than Tapered Roller Bearings) From France,

Germany, Italy, Japan, Singapore, and the United Kingdom ; Final Results of Antidumping Duty Administrative Reviews, 61 Fed. Reg. 2,081, 2,083 (January 15, 1997)).

This court and the Federal Circuit have held that Commerce may calculate antidumping duties by the entered value of sales.  See FAG Kugelfischer Georg Schafer KGaA v. United States, 19 CIT 1177, 1181 (1995), aff'd, 86 F.3d 1179 (Fed. Cir. 1996).  In FAG Kugelfischer, the plaintiff challenged Commerce's assessment rate methodology of dividing the calculated antidumping duties by the entered value of the sales used to calculate those duties, arguing that Commerce should have used actual entered value of entries during the period of review. Id. at 1178.  The Court rejected plaintiff's argument, concluding that Commerce's method was "more accurate" even though "Commerce was aware of [the plaintiff's] data on the record pertaining to total sales and actual entered values." Id. at 1181.

Here, Commerce additionally explained that it chose its methodology because it found that it "yields the best representation of what the dumping margins on sales of merchandise entered are because in most cases respondents are unable to link specific entries to specific sales." Final Decision Memo, cmt. 18 at 76.  While Thai I-Mei has provided the entry date for each of its reported U.S. transactions, Commerce choose to examine all sales during the POR, and not sales tied to POR entries, because "[a]bsent a complete universe of POR entries from which to derive the numerator of the assessment rate," Commerce found that it was "inappropriate to include the value of all POR entries in the denominator of th[e] calculation." Id.  Since Thai I-Mei did not have every POR entry marked and listed, Commerce reasonably choose only to examine sales during the POR.

**V**
**CONCLUSION**

For the foregoing reasons Plaintiff Ad Hoc's Motion for Judgment Upon the Agency

Record is DENIED, Plaintiff Thai I-Mei's Motion for Judgment Upon the Agency Record is

DENIED, and Commerce's determination in <u>Certain Frozen Warmwater Shrimp from Thailand:</u>

<u>Final Results and Final Partial Rescission of Antidumping Duty Administrative Review</u>, 72 Fed.

Reg. 52,065 (September 12, 2007) is AFFIRMED.


_/s/ Evan J Wallach____
Evan J. Wallach, Judge

Dated:  May 13, 2009
        New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

AD HOC SHRIMP TRADE ACTION
COMMITTEE,

          Plaintiff,

    v.

UNITED STATES,

          Defendant,

    and

THAI I-MEI FROZEN
FOODS CO., LTD. et al.,

          Defendant-Intervenors.

Before:        WALLACH, Judge

Consol. Court No.:  07-00378

## ORDER AND JUDGMENT

This case having come before the court upon the Motion for Judgment on the Agency Record filed by Ad Hoc Shrimp Trade Action Committee ("Ad Hoc's Motion"); and the Motion for Judgment on the Agency Record filed by Thai I-Mei Frozen Foods Co., Ltd. ("Thai I-Mei's Motion"); the court having reviewed all papers and pleadings on file herein, having heard oral argument by each party, and after due deliberation, having reached a decision herein; now, in conformity with said decision, it is hereby

ORDERED ADJUDGED AND DECREED that Ad Hoc's Motion is DENIED; and it is further

ORDERED ADJUDGED AND DECREED that Thai I-Mei's Motion is DENIED; and it is further

ORDERED ADJUDGED AND DECREED that the decision of the United States Department of Commerce in Certain Frozen Warmwater Shrimp from Thailand: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review, 72 Fed. Reg. 52,065 (September 12, 2007) is hereby AFFIRMED; and it is further

ORDERED that all parties shall review the court's Opinion in this matter and notify the court in writing on or before Thursday, May 21, 2009, whether any information contained in the Opinion is confidential, identify any such information, and request its deletion from the public version of the Opinion to be issued thereafter. The parties shall suggest alternative language for any portions they wish deleted. If a party determines that no information needs to be deleted, that party shall so notify the court in writing on or before Thursday, May 21, 2009.

/S/  Evan J. Wallach
_____
Judge

Dated: May 13, 2009
  New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                          Deputy Clerk